Scott E. Rahn, Esq. (SBN 222528)
rahns@rmolawyers.com
Sean D. Muntz, Esq. (SBN 223549)
muntzs@rmolawyers.com
David G. Greco (SBN 299635)
grecod@rmolawyers.com
**RMO LLP**
2029 Century Park East, Suite 2910
Los Angeles, CA 90067
Phone: (424) 320-9444

Attorneys for Plaintiff and the Proposed Class

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **J.F.**, a minor, by and through Guardians Ad Litem Aron Feiles and Alexandra Feiles, individually on and on behalf of the proposed class;<br><br>        Plaintiff,<br><br>      v.<br><br>**San Diego County Unified School District**, a government entity,<br><br>        Defendant. | Case No.: **'19CV2495 CAB LL**<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Violations of the Individuals with Disabilities Education Act;<br>2. Civil Rights Violations Under 42 U.S.C. § 1983;<br>3. Violations of the Americans with Disabilities Act;<br>4. Violations of Section 504 of the Rehabilitation Act; *and*<br>5. Civil Rights Violations Under Cal. Civ. Code § 52.1. |

CLASS ACTION COMPLAINT

## A.    <u>Introduction</u>

1.    Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., state actors must "ensure" that all eligible children with disabilities receive a free appropriate public education. 20 U.S.C. § 1412(a)(1). That is a "demanding" standard: students with disabilities must receive an "appropriately ambitious" educational program that gives them "the chance to meet challenging objectives." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1000 (2017).

2.    Defendant San Diego Unified School District has failed to fulfill its obligations under the IDEA, with regard to every student in its purview who is entitled to a one-on-one ("1:1") aide. Because of Defendant's system-wide policies and practices, Plaintiff and the Class do not consistently receive their 1:1 aide, and that failure results in a denial of a free appropriate public education. This case seeks Court intervention to correct that ongoing failure.

3.    Defendant has known of this problem for years, but it has done nothing to solve it. Rather, it continues the pattern of denying students their required 1:1 aides and implements stop-gap measures, like listing classroom teachers as 1:1 aides to feign compliance with students Individual Education Plans. Defendant's failure to provide 1:1 aides reverberates into all areas of students' educations, and poses safety issues for Class members and their classmates.

4.    Plaintiff J.F. and the Class of children he seeks to represent are harmed and/or are at substantial and imminent risk of harm because of Defendant's acts and omissions.

## B.    <u>Parties</u>

5.    Plaintiff J.F. is a public school student enrolled in Defendant's educational program. He is a resident of the County of San Diego, California. He qualifies for special education services under the IDEA. He is also a qualified individual with a disability under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. His Individual Education Plan entitles him to a 1:1

aide, but he has been systematically denied that aide due to Defendant's system-wide policies, practices, and failures. J.F. brings this action through his parents and guardians ad litem, Aron Feiles and Alexandra Feiles.

6.    Defendant San Diego Unified School District is a government entity and educational agency as defined in the IDEA. It is obligated to comply with the IDEA and provide eligible students a free appropriate public education in the least restrictive environment. It is a public entity covered by Title II of the ADA, 42 U.S.C. § 12131, *et seq.*, and receives federal financial assistance subject to Section 504, 29 U.S.C. § 794.

7.    Plaintiff is informed and believes that other entities or persons, whose identities are not yet known, contributed to the injuries giving rise to this complaint. These unknown parties may be individual, corporate, governmental, and/or some other form of existence; they acted as the employees, agents, or other representatives of the named Defendant. Plaintiff will seek leave of court to amend the complaint to allege the names of these unknown parties, when and if they are ascertained.

**C.    Jurisdiction & Venue**

8.    The Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, because it involves federal questions under the Constitution and laws of the United States of America, including but not limited to the Individuals with Disabilities Education Act (20 U.S.C. § 1400 *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701, *et seq.*), and the Fourteenth Amendment to the United States Constitution (under 48 U.S.C. § 1983). The Court has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367, because the state law causes of action arise from the same common nucleus of operative facts as Plaintiff's Federal causes of action.

9.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's principal place of operation is within the Southern District of California

CLASS ACTION COMPLAINT

1  and a large portion of the events giving rise to this suit occurred in the Southern

2  District of California. Plaintiff also resides in the Southern District of California.

3  **D.    Statutory Framework**

4  **1.    The Individuals with Disabilities Education Act**

5       10.    Congress intended for the Individuals with Disabilities Education Act

6  ("IDEA") to maximize educational opportunities for students with disabilities. *See*

7  20 U.S.C. § 1400(c)(1). Congress enacted the IDEA—an "ambitious piece of

8  legislation"—in response to the serious problem that "a majority of [disabled]

9  children in the United States were either totally excluded from schools or [were]

10 sitting idly in regular classrooms awaiting the time when they were old enough to

11 drop out." *Endrew F.*, 137 S. Ct. at 999 (internal quotation marks and citations

12 omitted). Such exclusion leads to "pervasive and tragic academic stagnation." *Id.*

13      11.    Students with certain disabilities qualify for "special education" under

14 the IDEA. 34 C.F.R. § 300.8(a). "Special education" means "specially designed

15 instruction . . . to meet the unique needs of a child with a disability . . . ." 34 C.F.R.

16 § 300.39. Educational agencies must provide this special education to qualifying

17 students, to meet their obligation to provide all students a free appropriate public

18 education. 20 U.S.C. § 1401(9); 34 C.F.R. §§ 300.17, 300.101, 300.112. The IDEA

19 imposes procedural and substantive requirements to ensure the student receives

20 instruction that meets his or her needs.

21      12.    One of those requirements is the creation of an Individual Education

22 Plan ("IEP"). An IEP is a written statement outlining the services that the educational

23 agency must provide. 20 U.S.C. § 1401(14); 34 C.F.R. §§ 300.22, 300.320(a). It is

24 developed by an IEP team, consisting of the student's parents, educators, and

25 (sometimes) the student. 20 U.S.C. §§ 1414(d)(1)(B)–(D); 34 C.F.R. §§ 300.23,

26 300.321(a). Parental participation is paramount. *E.g.*, 34 C.F.R. § 300.327. Likewise,

27 parental consent is required to execute an IEP and begin providing education to the

28

CLASS ACTION COMPLAINT

student. 20 U.S.C. § 1414(a)(1)(d)(i); 34 C.F.R. § 300.9. Parents may rescind consent at any time. 34 C.F.R. § 300.9(c).

**2.      The Americans with Disabilities Act & the Rehabilitation Act § 504**

13.    Under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, state actors may not discriminate against students on the basis of their disabilities.

14.    Congress enacted the ADA and Section 504 to address the discrimination that people with disabilities face when they are unnecessarily excluded from public life, such as the public school system, due to their disabilities. *See Olmstead v. L.C.*, 527 U.S. 581, 599–601 (1999).

**E.      Facts**

**1.    Defendant has known for years that its special education staffing was inadequate.**

15.    As far back as 2017, Defendant has known that its staffing for special education services was inadequate. Because of that staffing deficiency, related services also suffer.

16.    In May 2017, community members and some staff members sent a letter to Defendant. The letter emphasized that Defendant's then-proposed budget cuts would disproportionately affect students with disabilities. It focused specifically on "student-contact" positions—e.g., bus monitors, certified occupational therapy assistants (COTAs), speech-language pathologists (SLPs), custodians, special education behavioral technicians (SEBTs), school psychologists, library technicians, adaptive physical education (APE) teachers, etc. The letter concluded by demanding that Defendant adopt a plan that would not result in the denial of services to which students are entitled under their IEPs.

17.    At a 2017 board meeting, San Diego Unified Trustee Sharon Whitehurst-Payne admitted that Defendant has struggled to comply with its

CLASS ACTION COMPLAINT

obligations under the IDEA, stating "[w]ith special [education] it's interesting because our enrollment is declining, but our cost is increasing. Significantly so."

18.    The same year, Voice of San Diego reported that the school board cut the special education department's budget by $7.92 million. Voice of San Diego also reported "Principals say they are stressed and strained by a shortage of staff. The district has used interns to teach some special education classes and even asked parents to help fill aide positions." *See* https://bit.ly/2YzqT1S.

19.    One vice-principal stated that "[r]eduction of special [education] department at district level has made getting services and implementing [Individualized Education Programs] *impossible*." *Id.* (emphasis added).

20.    More poignant to this case, an elementary school principal stated that "para-educator allocation is insufficient creating supervision and safety concerns."

21.    Voice of San Diego further reported that the district was "adjusting across the system" with the goal of ensuring the budget cuts did not impact students. *Id.* As discussed throughout this complaint, that goal never reached fruition.

22.    In November 2017, Voice of San Diego published another report. The report focused specifically on parents' fears that their children were being endangered by Defendant's failure to adequately staff the special education classrooms within Defendant's purview. *See* https://bit.ly/2E2MSoi.

23.    The November 2017 article details accounts of students absconding from classrooms and otherwise being exposed to dangerous situations, as a result of inadequate staffing. At least two parents explained that their children—both of whom suffer from autism spectrum disorder—were being denied their 1:1 aides. One child was allowed to eat items that were not food, threatening the child's health.

24.    The staffing shortages also cause educational and behavioral regression in Defendant's students. One parent, interviewed in the November 2017 Voice article, explained that the 1:1 aide provided her child with the structure needed to ensure the child absorbed and implemented the lessons—and make the related educational

progress that comes with it. When the school started providing aides only inconsistently—sometimes a different aide from day to day—that progress reversed.

25.    To date, Defendant has failed to adequately staff its special education classrooms and has denied students the 1:1 aides to which their IEPs entitle them. The problem is compounded by the fact that—according to Defendant's employees— special education aides have a high turnover rate.

26.    Plaintiff J.F. and all members of the Class have been victims of Defendant's continued failures to comply with the Individuals with Disabilities Education Act and related laws.

**2.    Defendant fails to provide the required 1:1 aide to Plaintiff J.F. until the very end of the 2018-2019 school year.**

27.    J.F. is and at all relevant times was a student of Defendant. He qualifies for special education under the IDEA, because he suffers from autism spectrum disorder—first diagnosed on January 3, 2019—and speech issues. Defendant first evaluated J.F. for special education eligibility in March 2017. Defendant and J.F.'s parents eventually formed an IEP Team and developed an IEP for J.F.

28.    J.F. was enrolled in Gage Elementary School in San Carlos. Gage is a part of the San Diego Unified School District.

29.    J.F.'s parents utilize many services to assist J.F. in his education. Services include music therapy, speech/occupational therapy, Applied Behavior Analysis therapy, and equine therapy.

30.    Defendant has failed to comply with J.F.'s IEP since he first enrolled. That failure is a result of Defendant's systematic failure to fund and place 1:1 aides with students who are entitled to them under their IEPs. Defendant's practice is consistent and it affects every student whose IEP entitles them to a 1:1 aide.

31.    On October 4, 2018, Alexandra Feiles wrote to the principal of J.F.'s school, because she had learned that the in-classroom aide was being removed from J.F.'s classroom. Alexandra emphasized that it was "crucial for all the kids to have

the support and help," and that removal of the aide would be detrimental to J.F.'s education.

32. On February 11, 2019, Alexandra contacted school board member Kevin Beiser via email. She expressed her continuing concern that Defendant had not provided an aide to J.F., which Alexandra believed was necessary. She followed up again on February 12, after having spoken with Beiser. She emphasized that the failure to provide a 1:1 aide "cannot continue." That day, Defendant's Executive Director of Special Education replied to state that someone had "reached out to the site principal."

33. On March 4, 2019—while J.F. was still lacking a 1:1 aide—a substitute teacher told Alexandra that J.F. had a very difficult day of school, including attempting to abscond from school grounds. Alexandra emailed the school principal to express her concern—specifically, to highlight that the lack of a 1:1 aide had become a safety issue. The principal replied and in relevant part wrote, "We will continue to work on the supplemental support for [J.F.], but just having a person won't be the answer . . . it will need to be a person that has a plan." The principal did not elaborate on what steps Defendant would take to obtain the 1:1 aide. Additionally, the principal did not address or acknowledge that having a 1:1 aide would better ensure J.F.'s safety while in school.

34. On March 11 2019, Alexandra contacted the principal again to follow up on Defendant's failure to provide an IEP from a February meeting. A copy was never provided.

35. On March 13 2019, Defendant finally provided Alexandra with a draft IEP via email. However, the draft IEP was from April 17, 2017.

36. In April 2019, an observation was conducted of J.F. while in the classroom. The observation made it further apparent that J.F. needed a trained paraprofessional to support him throughout the day.

37.    The IEP Team was set for an IEP meeting on Wednesday April 17, 2019. Alexandra emailed Defendant to confirm. Due to an alleged miscommunication, that meeting was never scheduled. Defendant responded with an offer to convene an IEP meeting on April 26, 2019—near the end of the school year. After Alexandra exchanged several additional emails with Defendant's employees, Defendant agreed to convene an IEP meeting on April 24, 2019. Defendant promised it would provide a draft IEP at least forty-eight hours before the meeting. It did not.  Instead, it emailed the draft IEP on April 23, 2019.

38.    The IEP meeting convened on April 24. The Feiles Family had an advocate present and they recorded the meeting. On April 27 2019, Alexandra returned the draft IEP with comments and changes.

39.    Without enough aides present, J.F. does not follow instructions. This has resulted in Alexandra being called by school staff to come pick J.F. up in the middle of the school day. *Cf.* ¶ 24 (noting that staffing failures generate more behavioral problems among students with autism spectrum disorder).

40.    J.F. finally received a 1:1 aide on May 20 2019. He had the aide for only three weeks—the school year ended on June 11, 2019.

**3.    Defendant continues its failures during the 2019-2020 school year.**

41.    On September 3, 2019, Alexandra again contacted Defendant to inform Defendant that it had failed to provide the services mandated by J.F.'s IEP—specifically, that he had again been denied a 1:1 aide. She reiterated her concern that J.F. missed out on a significant amount of education in the prior school year due to Defendant's repeated delay in implementing the 1:1 aide.

42.    To date, Defendant has not consistently provided J.F. with a 1:1 aide, and instead has allowed J.F. to go without the required 1:1 aide for months at a time.

43.    The continued failure to provide J.F. with the required 1:1 aide has reverberated into the rest of J.F.'s education and created additional unnecessary problems. It has resulted in an escalation of problematic behaviors and unnecessary

difficulties in returning J.F. to a functional mood. Had J.F. been provided with the required 1:1 aide, his behavior would not have devolved in this manner.

44.    Further, J.F. usually does not attend the regular kindergarten class—despite that his IEP entitles him to do so—because he is under-supervised. He is also more prone to acting out and misbehaving when he does not receive the amount of attention required by his IEP. This includes situation that endanger J.F.'s safety, like absconding from the classroom when there is inadequate staff to return him safely to the building. *Cf.* ¶ 20 (noting safety concerns caused by understaffing).

45.    Recently, in December of 2019, Aron and Alexandra learned that J.F. had been allowed to attend the general education kindergarten class—which is required by his IEP. However, because he lacks a 1:1 aide, J.F. does not learn while in the general education class—he plays and moves around at his own will, while other children learn. He receives no benefit from attending.

46.    Ultimately, the failure to provide the required 1:1 aide has resulted in a near complete denial of any education for J.F. whatsoever. *Cf.* ¶ 24 (noting that staffing shortages hurt students' educational progress).

47.    Most recently, J.F. has refused to attend the general education class, because Defendant has provided an aide who sits with him during the general education class. J.F.'s refusal is the result of a protest: he now does not want to attend the general education class because he is required to do work rather than play unsupervised. He has become accustomed to this unsupervised time. He is thus being denied the benefit of the general education class, even with the aide.

48.    Defendant occasionally attempts to feign compliance with J.F.'s IEP by listing the classroom teacher—who supervises every child—as J.F.'s 1:1 aide.

49.    This system-wide practice—of providing 1:1 aides only intermittently or not at all—results from the choices Defendant makes regarding funding and personnel management. The failures and stop-gap measures fall short of Defendant's obligation to ensure that all students receive a free appropriate public education.

**4.     Plaintiff was not required to exhaust any administrative remedies.**

50.     A plaintiff need not exhaust his or her administrative remedies for an IDEA claim, when the defendant's policies are facially unlawful and an administrative challenge to those policies would not provide the administrative body an adequate opportunity to correct the defendant's misbehavior. *Hoeft v. Tuscon Unified School Dist.*, 967 F.2d 1298, 1308 (9th Cir. 1992). Defendant's uniform policies are facially unlawful because Defendant consistently denies eligible students their 1:1 aides on a system-wide basis. The administrative courts would be powerless to correct the uniform failure.

51.     Similarly, a plaintiff need not exhaust his or her administrative remedies where "structural, systemic reforms are sought." *Hoeft*, 967 F.2d at 1309. In this case, Defendant systemically denies IDEA-qualified students' access to a free appropriate public education by failing to provide 1:1 aides due to its staffing choices.

52.     Further, exhaustion is excused when "the administrative process is [not] adequately equipped to address and resolve the issues presented." *Hoeft*, 967 F.2d at 1309. As mentioned above, the administrative court would be powerless to correct Defendant's uniform failure to provide adequate staffing, because the administrative courts have jurisdiction solely over individual students' disputes with Defendant. Administrative courts do not have authority to order system-wide reform.

**F.     Class Allegations**

**1.     Definitions**

53.     The **Class** is defined as:

> All students, whether minors or adults, who are eligible for 1:1 aides under the IDEA and related laws, and who are currently being denied consistent 1:1 aides due to Defendant's system-wide failure to fund and administer those services.

54.     J.F. is a member of, and the class representative for, the Class.

**2.      The Class satisfies F.R.C.P. 23(a)(1)-(4).**

55.      First, the Class is so numerous that joinder of all members is impracticable under F.R.C.P. 23(a)(1). On information and belief, Plaintiff alleges there are thousands of students in the Class. As of December 2016, there were 15,189 students with disabilities in Defendant's educational program. While not all of those students require 1:1 aides, even 10% of those students would be more than 1,000 Class members. Having several hundred or several thousand individuals appear in one action would be unmanageable and a waste of judicial resources. Joinder is impracticable.

56.      Second, there are multiple questions of law and fact common to the Class, under F.R.C.P. 23(a)(2). J.F. and the Class have suffered the same legal wrong, as a consequence of the same system-wide, uniform policy and acts/omissions by Defendant. J.F. and the members of the Class have the same legal relationship with Defendant, and have all suffered damages of the same type. It would be impossible to prove J.F.'s claims without simultaneously proving the Class members' claims. Nearly every question of law or fact in this action is common to the class and to J.F.

57.      Third, the claims of J.F. are typical of the Class under F.R.C.P. 23(a)(3). J.F. and all members of the Class have the same claim that arises from the same foundation: that they are victims of Defendant's uniform, system-wide policy that denies special needs students the 1:1 aides to which their IEPs entitle them. There is no material deviation between the facts and law giving rise to J.F.'s claims and those of the Class.

58.      Fourth, J.F., as a representative plaintiff, with the assistance of Aron and Alexandra Feiles, will fairly and adequately protect the interests of the Class under F.R.C.P. 23(a)(4). The Family has undertaken significant time and effort to obtain information in this action and to facilitate the filing of this case.

**3.      The Class satisfies F.R.C.P. 23(b)(3).**

59.      The Class can be maintained under F.R.C.P. 23(b)(3), because there are not only common questions of law or fact, but those common questions predominate over any individual issues. Those common questions of law and fact include but are not limited to: whether Defendant maintains a system-wide policy of denying eligible students consistent access to a 1:1 aide; and whether those failures result in danger to the students and/or a denial of a free appropriate public education.

60.      Moreover, the class action device is most appropriate for the fair and efficient adjudication of this controversy, because it will combine this litigation into one forum, there are no other large-scale actions that have been filed, and no unique difficulties exist in the management of this action.

61.      As of December 2016, there were 15,189 students with disabilities in Defendant's educational program. (Again, while not all of those students require 1:1 aides, even 10% of those students would be more than 1,000 Class members.)

62.      Defendant's conduct has caused and continues to cause J.F. and the Class great harm. Defendant's conduct puts J.F. and the Class at great risk of further harm.

**G.      Causes of Action**

**1.      *First Cause of Action*: Violations of the IDEA**
**On behalf of the Class**

63.       Plaintiff and the members of the Class are children with disabilities and are eligible for special education under the IDEA.

64.      Defendant is a government educational entity subject to the requirements of the IDEA.

65.      By doing the acts alleged in this Complaint, Defendant has violated the rights of Plaintiff and the Class members under the IDEA and related regulations, including by denying students the 1:1 aides to which their IEPs entitle them. This

failure results in further problems that effectively deny Plaintiff and the Class members a free appropriate public education.

**2.    *Second Cause of Action*: Civil Rights Violations—42 U.S.C. § 1983 On behalf of the Class**

66.    Defendant is a state actor for purposes of section 1983.

67.    Specifically, Defendant is acting under the color of state law because it is serving as a provider of education, as mandated by 20 U.S.C. § 1400, *et seq. Cf., e.g.*, *K.H. v. Antioch Unified School District et al.*, 2019 WL 2744721, at *5 (N.D. Cal. July 1, 2019) (denying motion to dismiss because charter school could be considered government entity when it acts as provider of educational services).

68.    The relationship between Defendant and the State are sufficiently close such that Defendant was acting under color of state law. Defendant was engaged to provide a traditionally government function, the provision of education, which requires certain acts be done in compliance with state and Federal law.

69.    A government entity assumes an affirmative duty under the Fourteenth Amendment to the U.S. Constitution to provide reasonable care to, and to protect from harm, a child or disabled adult with whom it has formed a special relationship.

70.    The foregoing actions and inactions of Defendant constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the Class. Defendant is well aware of the policies and practices in place, which prevent these class members from receiving adequate protection from physical and psychological harm after Defendant has formed a special relationship with them. As a result, the named Plaintiff and all of the members of the class of students to whom Defendant owes a special duty, students who have a special relationship with Defendant, have been, and are, at risk of being deprived of their substantive due process rights conferred upon them by the Fourteenth Amendment to the U.S. Constitution.

71.    The substantive due process rights include, but are not limited to:

a.    The right to safe school conditions and supervision by educators and other personnel who act according to the applicable standards of care;

b.    The right to protection from unnecessary intrusions into students' emotional wellbeing by Defendant and Defendant's employees, who have a special relationship with the students;

c.    The right to services necessary to prevent unreasonable risk of harm; and

d.    The right to treatment and care consistent with the purposes and assumptions of attending and being supervised by Defendant and Defendant's employees; *Doe v. New York City Dept. of Social Services*, 709 F.2d 782 (2d Cir. 1983) (explaining "agency could be held liable under section 1983 if its top supervisory personnel . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution.").

72.    Because of these violations, the Class, including J.F., have suffered emotional distress, physical harm, and other damages.

73.    The Class is entitled to injunctive and compensatory relief.

**3.    *Third Cause of Action*: Violations of the Americans with Disabilities Act On behalf of the Class**

74.    Congress enacted the Americans with Disabilities Act after it found that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue today. "Individuals who have experienced discrimination on the basis of disability often had no legal recourse to redress such discrimination." 42 U.S.C. § 12101(a).

75.     Thus, Congress sought "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

76.     Title II of the Americans with Disabilities Act entitles Plaintiff and the Class to the protections of the "public services" provision, which prevents discrimination by any "public entity," including any state or local government, as defined by 42 U.S.C. § 12131.

77.     Defendant qualifies as a public entity because it is charged with providing education, which is traditionally a government function.

78.     At all relevant times, J.F. and the Class were individuals with disabilities.

79.     Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of his or her disability.

80.     Accordingly, Defendant must provide the Class an equal opportunity to attend a school environment that is safe and provides a free appropriate public education.

81.     Defendant must also "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

82.     As a direct and proximate result of Defendant's violation of the ADA, the Class have been and are at risk of being placed in an environment that subjects them to unnecessary trauma because of their disabilities, as discussed above. The Class will continue to suffer injury until Defendant is required to, and does, come into compliance with the requirements of the ADA.

83.    The relief sought by Plaintiff on behalf of himself and the Class would not require a fundamental alteration to Defendant's programs, services, or activities.

**4.    *Fourth Cause of Action*: Violations of Section 504 of the Rehabilitation Act On behalf of the Class**

84.    "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

85.    Any person who is subjected to discrimination in violation of this statute may bring a civil action seeking compensatory, injunctive, and other appropriate relief. 29 U.S.C. § 794a(a)(2).

86.    Defendant has violated Section 504 by affirmatively discriminating against the Class. Specifically, Defendant has denied the Class a free appropriate public education by denying Class members the 1:1 aides to which their IEPs entitle them.

87.    The relief sought by Plaintiff on behalf of himself and the Class would not require a fundamental alteration to Defendant's programs, services, or activities.

**5.    *Fifth Cause of Action*: Civil Rights Violations—Cal. Civ. Code § 52.1 On behalf of the Class**

88.    "Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under [Cal. Civil Code § 52], injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct . . . ." Cal. Civ. Code § 52.1

89.     The laws, liberties, and considerations in paragraphs 66-69 apply equally to this cause of action.

90.     Additionally, the California Constitution guarantees that "persons will not be deprived of due process or equal protection of law on the basis of developmental disability alone.*" In re Hop*, 29 Cal. 3d 82, 89 (1981). "Personal liberty is a fundamental interest, second only to life itself." *Id.* (citations omitted, punctuation altered).

91.     The rights that have been violated include, but are not limited to:

a.     The right to safe school conditions and supervision by educators and other personnel who act according to the applicable standards of care;

b.     The right to protection from unnecessary intrusions into students' emotional wellbeing by Defendant and Defendant's employees, who have a special relationship with the students;

c.     The right to services necessary to prevent unreasonable risk of harm; and

d.     The right to treatment and care consistent with the purposes and assumptions of attending and being supervised by Defendant and Defendant's employees.

**H.     Relief Sought**

Plaintiff seeks the following relief:

1.     An order certifying the class defined in paragraph 53 above, and/or any other classes or sub-classes the Court deems appropriate;

2.     An order declaring that Defendant has violated the Individuals with Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

3.     An order permanently enjoining Defendant from subjecting the Classes to practices that violate their rights, including but not limited to the practices

described in in this complaint, and affirmatively requiring Defendant to comply with the provision of services to the Class required by the IDEA, ADA, and Rehab. Act;

4.    An order declaring Defendant's acts unconstitutional and unlawful;

5.    An order mandating that Defendant, under Court supervision for no less than a period of seven years: develop, adopt, and implement policies that ensure that all Class members and future eligible students receive a free appropriate public education, including by ensuring that eligible students consistently receive 1:1 aides;

6.    An order awarding reasonable attorneys' fees under 42 U.S.C. § 1988, the Americans with Disabilities Act, 29 U.S.C. § 794a(b), Federal Rules of Civil Procedure 23(e) and (h), California Civil Code § 52.1(i), California Civil Procedure Code § 1021.5, the IDEA, and any other statutes allowing fees for the claims asserted in this complaint;

7.    For costs of suit under 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 23(h); and

8.    For all other relief this Court deems just and proper.

Dated: December 30, 2019          **RMO LLP**

          ___/s/ David Greco_____
          David Greco

          Scott E. Rahn, Esq. (SBN 222528)
          rahns@rmolawyers.com
          Sean D. Muntz, Esq. (SBN 223549)
          muntzs@rmolawyers.com
          David G. Greco (SBN 299635)
          grecod@rmolawyers.com
          2029 Century Park East, Suite 2910
          Los Angeles, CA 90067
          Phone: (424) 320-9444

          Attorneys for Plaintiff and the Class